{¶ 1} Relator, Juan A. Valentine, commenced this original action requesting a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
 {¶ 2} Pursuant to Civ.R. 53, and Section (M), Loc.R. 12 of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In that decision, the magistrate concluded that the commission abused its discretion with respect to its threshold medical determination because the psychiatric/psychological report cited by the commission does not support a finding that the psychiatric claim allowance permits sustained remunerative employment. The magistrate noted that the commission does not have the medical expertise to combine Dr. John G. Nemunaitis' physical findings with Dr. Donald J. Tosi's statement on the potential causes of major depression in reaching its own conclusion that the psychiatric claim allowance is not work prohibited.
 {¶ 3} The magistrate further determined that the commission is free to accept or reject medical opinions of record in determining disability, but it cannot fashion its own medical opinion from the findings contained in those medical reports. Moreover, the magistrate determined that the issue of relator's purported failure to rehabilitate or retrain was not properly before the court. Therefore, the magistrate recommended that this court issue a writ of mandamus ordering the commission to vacate its order denying relator's PTD application, and in a manner consistent with his decision, enter a new order either granting or denying the PTD application.
 {¶ 4} No objections have been filed to the magistrate's decision.
 {¶ 5} Finding no error of law or other defect on the face of the magistrate's decision, we adopt the decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, this court issues a writ of mandamus ordering respondent, Industrial Commission of Ohio, to vacate its order denying relator's PTD application, and, in a manner consistent with the magistrate's decision, enter a new order either granting or denying the PTD application.
Writ of mandamus granted.
TYACK and BROWN, JJ., concur.
 DECISION IN MANDAMUS {¶ 6} In this original action, relator, Juan A. Valentine, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 7} 1. On January 12, 1994, relator sustained an industrial injury while employed as a janitor for respondent American Building Maintenance, a state-fund employer. On that date, as he lifted a metal bucket to empty water, relator felt a sharp pain in his back. The industrial claim was initially allowed for "sprain back, sprain lumbar spine," and was assigned claim number 94-162.
 {¶ 8} 2. According to relator, he has not worked since January 12, 1994. He received temporary total disability ("TTD") compensation for his back injury until June 10, 1996, when the commission found that the back injury had reached maximum medical improvement ("MMI"). (Relator's brief at 7.) The commission does not challenge those factual assertions. (See commission's brief.)
 {¶ 9} 3. According to relator, the commission additionally allowed the claim for "depressive psychosis-severe" on October 8, 1997. (Relator's brief at 7.) Relator received TTD compensation for his psychiatric disability until February 3, 1999, when the commission found that the alleged psychiatric condition had reached MMI. (Relator's brief at 7.) The commission does not challenge those factual assertions. (See commission's brief.)
 {¶ 10} 4. In the meantime, on August 22, 1997, at the request of the Ohio Bureau of Workers' Compensation ("bureau"), relator was examined by psychologist Donald J. Tosi, Ph.D. In his report, Dr. Tosi indicates that he is evaluating relator at the bureau's request because relator requested an additional claim allowance. Dr. Tosi concluded that relator was experiencing "major depression, recurrent, without psychotic features (DSM-IV 296.33)," and that the condition is the direct and proximate result of the industrial injury. Dr. Tosi's report further states:
 {¶ 11} "* * * Episodes of major depression often follow a severe psychosocial stressor (death of a loved one, divorce, industrial injury). Depressive symptoms appeared in relatively close proximity to the injury. No significant psychosocial stressors were operative at the time of the injury.
 {¶ 12} "* * *
 {¶ 13} "* * * He is in need of psychotropic medication and psychotherapy at least twice a month for the next six months. He should be reevaluated in six months or so to determine MMI.
 {¶ 14} "* * * At the present time, I do believe that the claimant's major depressive disorder alone is of sufficient severity to prohibit him from working at his former job or any other job."
 {¶ 15} 5. The stipulation of evidence filed by the parties does not contain the commission's order granting the additional claim allowance for "depressive psychosis-severe." Accordingly, we do not know whether the commission relied, even in part, upon Dr. Tosi's report to support the additional claim allowance.
 {¶ 16} 6. On October 12, 1998, relator underwent a psychiatric evaluation performed by Manual E. Gordillo, M.D. In his report, Dr. Gordillo indicates that he evaluated for the allowed condition "depressive psychosis-severe." Dr. Gordillo diagnosed "Major depression, single, with psychotic features." He recommend electroconvulsive treatment ("ECT"). Dr. Gordillo wrote:
 {¶ 17} "* * * [H]e has not reached maximum medical improvement. His condition is still susceptible to treatment. The treatment given by his attending psychiatrist has not stabilized him, although while the attending psychiatrist thinks he will need combinations of antidepressants, the type of diagnosis and course of treatment requires at this point electroconvulsive therapy, and if he refuses then he will end up with maximum medical improvement with poor prognosis.
 {¶ 18} "* * *
 {¶ 19} "* * * He is unable to work at this time because of his chronic pain and major depression.
 {¶ 20} "* * *
 {¶ 21} "* * * He has a subjective chronic pain rating of 8-9, and it is suspected also if the ECT is given that pain will lower and he will be able to return to work. Without ECT he will be unable to work, the pain is not expected to change, and without ECT is expected to stay at the maximum level of improvement with poor prognosis."
 {¶ 22} 7. On February 21, 2001, relator filed an application for PTD compensation. In support, relator submitted a report from clinical psychologist James M. Medling, Ph.D., who evaluated relator on November 9, 2000. Dr. Medling's report states:
 {¶ 23} "Diagnostically, Juan continues to present with Major Depression, Recurrent, Severe without Psychotic Features. His complaints of Depression remain as a direct and proximate result of his 1994 work injury.
 {¶ 24} "He has experienced a difficult adjustment to a reduced level of functioning and efficiency in life. He presents with high moderate to marked impairment in his activities of daily living and marked impairment in socialization. His concentration is poor due to his experience of pain, recurring worries, fears and complaints of depression. His tolerance for frustration is low and he is easily defeated by his experience of pain which causes him to withdraw in a mixture of anger and depression. Due to a below average level of activity he does not persist at tasks to completion and as such pacing is not undertaken. He has few strategies for the relief of stress. He reports to confide in his counselor but also complained that treatment has been unable to return him to his preinjury level of functioning.
 {¶ 25} "Based upon AMA Guideline[s] to the Evaluation of Permanent Impairment, Fourth Edition, it is this examiner's opinion that the [sic] his complaints of Major Depression fall at the 45% range. It is this examiners opinion that Juan's psychological condition renders him permanently and totally disabled from all forms of gainful employment."
 {¶ 26} 8. On May 31, 2001, relator was examined by commission specialist and physiatrist John G. Nemunaitis, M.D. Dr. Nemunaitis reported:
 {¶ 27} "DISCUSSION:
 {¶ 28} "The claimant does have mild residual biomechanical problems as a sequelae of his injury in 1994 however, there is no verification of a radiculopathy on examination. His reflex changes are likely related to his diabetic polyneuropathy. The neurological examination did not substantiate a radiculopathy. Although the claimant did demonstrate symptom magnification and a low pain threshold as part of the examination, he was able to function reasonably well and in fact was able to sit for a prolonged period of time without demonstrating pain. He does have other medical problems including diabetes mellitus but these are not allowed conditions. Based on the examination today as it relates to the allowed conditions, the claimant is able to function at sedentary work capacity. The claimant was not examined relative to depressive psychosis severe. This will be done by another examiner.
 {¶ 29} "OPINION:
 {¶ 30} "* * *
 {¶ 31} "* * * The percentage of whole person impairment relating to sprain back, sprain lumbar spine is DRE Lumbosacral Category II or 5% as a whole person. * * *
 {¶ 32} "* * * The claimant is capable of physical work activity minimally at a sedentary work capacity as it relates to his physical impairments based on the exam today."
 {¶ 33} 9. On June 5, 2001, relator was examined by commission specialist and psychologist Robert L. Byrnes, Ph.D. Dr. Byrnes reported:
 {¶ 34} "* * * [I]t is my opinion that to a reasonable degree of medical probability Mr. Valentine has reached maximum medical improvement relative to his allowed mental condition (Depressive Psychosis, Severe). From the report is appears that his activities of daily living have become more restricted since being injured at work. He is now socially withdrawn and interacts minimally with others. He is not involved in much purposeful activity. His adaptive capacity is strained.
 {¶ 35} "According to the AMA Guides to the Evaluation of Permanent Impairment IV, I find this claimant's impairment to be marked to moderate and I assign a 45% whole person impairment for his allowed mental condition only."
 {¶ 36} 10. Dr. Byrnes completed an occupational activity assessment ("OAA") report on June 5, 2001. The OAA form poses a two-fold query to the examining psychologist:
 {¶ 37} "Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this claimant meet the basic mental/-behavioral demands required:
 {¶ 38} "[1] To return to any former position of employment?
 {¶ 39} "[2] To perform any sustained remunerative employment?"
 {¶ 40} 11. Dr. Byrnes answered both queries in the negative.
 {¶ 41} 12. The commission requested an employability assessment report from psychologist Thomas O. Hoover, Ph.D., who is also a vocational expert. The Hoover vocational report, dated July 7, 2001, responds to the following query:
 {¶ 42} "Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed conditions(s) [sic], identify occupations which the claimant may reasonably be expected to perform, (A) immediately and/or, (B) following appropriate academic remediation or brief skill training."
 {¶ 43} 13. Indicating acceptance of Dr. Nemunaitis' report and responding to the above query, Hoover listed "employment options" stating:
 {¶ 44} "Current options include the following occupations in which this claimant is presently employable without any skills development nor any academic remediation. These positions have each been rated by the DOL as sedentary. * * *"
 {¶ 45} 14. Indicating acceptance of Dr. Byrnes' report and responding to the above query, Dr. Hoover wrote:
 {¶ 46} "Not employable according to the RFC developed by this practitioner."
 {¶ 47} 15. Under "effects of other employability factors," Hoover states:
 {¶ 48} "* * * Past work history illustrates that this claimant has been able to learn various tasks, perform safely, and adapt to job demands required of full time employment even though he immigrated to a country where he did not speak the language.
 {¶ 49} "* * *
 {¶ 50} "* * * Claimant has completed eight years of formal education in Puerto Rico. * * *
 {¶ 51} "* * *
 {¶ 52} "Considering past work accomplishments and formal education achieved there is no basis to find incapacity for academic re-mediation [sic] to the 7-8th grade level.
 {¶ 53} "* * *
 {¶ 54} "Based on the limited amount of formal education completed and work experiences it is likely that successful retraining would be best by demonstration, which is how most entry level positions skills are acquired and how he likely learned to do many of his jobs after moving to the United States.
 {¶ 55} "Rehabilitation with career counseling, job coaching and language skills may be helpful in returning Mr. Valentine to the work force. Unfortunately he has lived in the United States for a dozen years and apparently had not made an effort to learn the language of his new homeland. Even if he had not been injured his decision to not learn English would still be having a dramatic negative impact on his ability to interact productively in our society.
 {¶ 56} "* * *
 {¶ 57} "* * * [I]f he were motivated and not experiencing his psychiatric disorder, he would be a candidate to learn new skills and return to doing entry level jobs, as he had been doing when injured[.] Psychologists who have examined Mr. Valentine emphasize that he is clinically depressed and that his impairment is so severe that it would have a negative impact on concentration and motivation. Realistically the claimant's depressive disorder makes it very unlikely that, in view of his past behavior, that he would profit from remediation and therefore those positions listed by this examiner in Section II are probably not very realistic. Were he living in a Spanish speaking country, or had he learned English, there would be many sedentary positions open to him with brief retraining."
 {¶ 58} 16. Following a September 20, 2001 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order states:
 {¶ 59} "This order is based particularly upon the reports of Drs. Nemunaitis dated 05/31/2001, Tosi dated 08/22/1997, and Gordillo dated 10/12/1998.
 {¶ 60} "The claimant was injured on 01/12/1994. He was injured when he lifted a bucket of water. The claimant injured his low back. He has never returned to work. He was 40 years old at the time.
 {¶ 61} "On 10/08/1997 the BWC additionally allowed the claim for `depressive psychosis severe.' The claimant alleges that due to his inability to function because of his low back and his pain in his low back, he developed the depressive psychosis.
 {¶ 62} "On 02/21/2001, the claimant filed for Permanent Total Disability benefits. He filed a report from Dr. Medling to support his application. The report of Dr. Medling states that it is claimant's psychological condition which is preventing the claimant from returning to his former position of employment or to any employment.
 {¶ 63} "The claimant was asked whether he is alleging he is permanently and totally disabled based upon the physical condition, the psychological condition, or both.
 {¶ 64} "[C]laimant's counsel argued that it is claimant's psychological condition, as evidenced by Dr. Medling's report, which is preventing the claimant from sustained remunerative employment.
 {¶ 65} "The Staff Hearing Officer finds claimant is not entitled to permanent total disability benefits and his Permanent Total Disability application filed 02/21/2001 is denied.
 {¶ 66} "The Staff Hearing Officer finds claimant is not alleging he is permanently and totally disabled on the physical condition of sprain of back.
 {¶ 67} "The only medical evidence regarding the claimant's disability on this 7 year old soft tissue injury, is the 05/31/2001 report of Dr. Nemunaitis.
 {¶ 68} "Dr. Nemunaitis found inconsistent findings. The `claimant demonstrated pain with light palpation of the skin which was [sic] appeared to be an exaggeration of his pain response.' `The claimant was able to demonstrate a significantly greater mobility as part of his functional activities such as sitting down and climbing onto the table, dressing, etc. Therefore, the lumbar active ranges of motion were NOTValid.'
 {¶ 69} "The `claimant had no active disc or root signs. Straight leg raising in a sitting position was 60 degrees bilateral and in a lying position 30 degrees bilaterally, further reflecting probable symptom magnification.'
 {¶ 70} "In short, Dr. Nemunaitis, found the claimant exaggerated his symptoms. This is consistent with the nature of a 7 year old soft tissue injury which normally would heal sometime in 1994.
 {¶ 71} "The claimant does not allege permanent total disability on the physical condition and the Staff Hearing Officer finds claimant is not permanently and totally disabled on the sprain back condition. The restrictions of Dr. Nemunaitis were reviewed by Thomas Hoover, the vocational expert, on 07/07/2001.
 {¶ 72} "Mr. Hoover found that based upon the restrictions of Dr. Nemunaitis, the claimant would be able to find employment `without any skills development nor any academic remediation.'
 {¶ 73} "In addition, the claimant has performed jobs which fall within the restrictions of sedentary employment in the past.
 {¶ 74} "The claimant has worked as a gas station attendant and a security guard. He was also self-employed as a painter, indicating the skills needed to run a business, obtain jobs, communicate with people, read, understand, and write business documents and have a general understanding of banking and finances.
 {¶ 75} "For these reasons, it is found claimant is not permanently and totally disabled based on the physical condition.
 {¶ 76} "A review of the claimant's psychological condition must begin with the underlying physical condition.
 {¶ 77} "Claimant is alleging he is unable to work based upon his psychological allowance.
 {¶ 78} "Yet, this psychological allowance is based upon the allegation that the claimant has severe limitations upon his back in addition to the pain. This which [sic] is not supported by physical exam.
 {¶ 79} "A review again of Dr. Nemunaitis' report on the physical nature of his back reveals that the claimant is not as restricted as he alleges. Dr. Nemunaitis found inconsistent pain findings and symptom magnification.
 {¶ 80} "A review of the psychological reports indicate as Dr. Tosi did in his 08/22/1997 report, that `episodes of major depression often follow a severe psychosocial stressor (death of a loved one, divorce, industrial injury).'
 {¶ 81} "Yet the underlying industrial injury is not `severe' as the inconsistent findings and symptom magnification found by Dr. Nemunaitis indicates.
 {¶ 82} "But the major reason for denial of permanent total disability benefits is claimant's failure to rehabilitate.
 {¶ 83} "Even assuming claimant's psychological condition is as severe as he alleges, the claimant has failed to rehabilitate.
 {¶ 84} "At the time of the injury, the claimant was 40 years old. The file reflects a rehabilitation closure of 05/28/1999 due to non-responsive [sic] of the claimant to contact the rehabilitation department.
 {¶ 85} "In 1996 an earlier rehabilitation contact was closed as the claimant's physician of record stated claimant was unable to participate.
 {¶ 86} "Under the decisions in The State ex rel. Wilson v. Industrial Commission 80 Ohio St.3d 250, and The State ex rel. Paraskevopoulos, 83 Ohio St.3d 189, the court held;
 {¶ 87} "`It is not unreasonable to expect workers' compensation claimant seeking permanent total disability compensation to participate in return to work efforts to best of his abilities or to take initiative to improve reemployment potential, and while extenuating circumstances can excuse claimant's nonparticipation in reeducation or retraining efforts, claimant should no longer assume that participatory role, or lack thereof, will go unscrutinized.'
 {¶ 88} "The case at bar is similar to the facts in Paraskevopoulos. There, as here `claimant's illiteracy relates more to his status as an immigrant than to any intellectual deficit.'
 {¶ 89} "The claimant has demonstrated the intellectual ability to learn based upon the prior jobs he held as discussed earlier.
 {¶ 90} "Claimant was 40 years old when injured and has not provided any evidence that he has attempted to rehabilitate himself or improve his prospects for employment.
 {¶ 91} "Claimant is currently 47 and would still be young enough to attempt a rehabilitation course. This would be considered a young person and the Staff Hearing Officer considers this a strong vocational factor.
 {¶ 92} "It is clear that claimant is too young and has not exhausted the rehabilitation avenues which he has declined in the past.
 {¶ 93} "If after all rehabilitation avenues have been exhausted and the claimant's condition and restrictions remain the same, a new application for permanent total disability benefits can be filed at that time a different finding may be made. At present, at claimant's young age, it seems premature to consider claimant permanently disabled. With additional treatment it is conceivable that the claimant could return to the workforce." (Emphasis sic.)
 {¶ 94} 17. On May 22, 2002, relator, Juan A. Valentine, filed this mandamus action.
Conclusions of Law:
 {¶ 95} Initially, the commission was required to determine whether one or more allowed conditions of the claim not only prohibit relator's return to the former position of employment, but, also, whether they prohibit any sustained remunerative employment. If the commission were to determine that relator cannot return to his former position of employment, but that he can perform some sustained remunerative employment, the non-medical factors would need to be considered. However, if the commission were to determine that an allowed condition prohibits all sustained remunerative employment, it must enter a finding that relator is permanently and totally disabled without reference to the vocational factors. Ohio Adm. Code 4121-3-34(D)(2)(a) and (b).
 {¶ 96} Relator premised his PTD application largely on the psychiatric claim allowance, supporting it with a report from psychologist Dr. Medling. Hence, the commission's threshold duty required it to initially determine whether the psychological claim allowance prohibits sustained remunerative employment irrespective of the vocational factors.
 {¶ 97} Because the commission abused its discretion with respect to its threshold medical determination, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 98} Initially, the commission's order states reliance upon the reports of Drs. Nemunaitis, Tosi, and Gordillo.
 {¶ 99} Significantly, Dr. Byrnes' report is not mentioned in the commission's order. Apparently, the commission determined to reject Dr. Byrnes' opinion that the psychological claim allowance precludes all sustained remunerative employment.
 {¶ 100} Neither of the psychiatric/psychological reports cited by the commission provide some evidence to support a finding that the psychiatric claim allowance permits sustained remunerative employment. Dr. Tosi opined, in August 1997, that the major depressive disorder alone is of sufficient severity to prohibit work at the former job or at any other work. Dr. Gordillo opined, in October 1998, that relator was "unable to work at this time."
 {¶ 101} Moreover, the reports of Drs. Tosi and Gordillo do not appear to be time relevant to the PTD adjudication. Drs. Tosi and Gordillo both opined in their reports that the psychiatric condition was not yet at MMI. Both reports precede the commission's presumed February 3, 1999 determination that the psychiatric claim allowance had reached MMI.
 {¶ 102} Nevertheless, the commission apparently found Dr. Tosi's report to be useful in reaching its own medical conclusion, never expressly stated in the order, that the psychiatric claim allowance is not completely work prohibitive. In its order, Dr. Tosi's statement that "episodes of major depression often follow a severe psychosocial stressor" is combined with Dr. Nemunaitis' findings of minimal impairment (five percent) and "symptom magnification" to support a medical conclusion that the physical aspects of the industrial injury are not severe enough to produce a work prohibitive psychiatric disorder. This was an abuse of discretion.
 {¶ 103} It is well-settled that the commission must rely upon medical evidence in order to determine disability. State ex rel. Yellow Freight Sys., Inc. v. Indus. Comm. (1998), 81 Ohio St.3d 56. Neither the commission nor its hearing officers have medical expertise. Id.
 {¶ 104} Thus, the commission did not have the medical expertise to combine Dr. Nemunaitis' physical findings with Dr. Tosi's statement on the potential causes of major depression to reach its own conclusion that the psychiatric claim allowance is not work prohibitive. Id.
 {¶ 105} The commission is free to accept or reject medical opinions of record in determining disability. However, it cannot fashion its own medical opinion from the findings contained in the medical reports such as might be done by a non-examining physician who is asked by the commission to review the medical evidence of record. See State ex rel. Wallace v. Indus. Comm. (1979), 57 Ohio St.2d 55, 59. (The non-examining physician is required to expressly accept all the findings of the examining physician, but not the opinion drawn therefrom.) State ex rel. Blue v. Indus. Comm. (1997), 79 Ohio St.3d 466.
 {¶ 106} Accordingly, the commission abused its discretion in determining the threshold medical issue regarding the impact of the psychiatric claim allowance on relator's ability to work.
 {¶ 107} Relief pursuant to State ex rel. Gay v. Mihm (1994),68 Ohio St.3d 315, is inappropriate here. Ordinarily, where the commission abuses its discretion in a PTD determination on the threshold medical issue, a limited writ of mandamus is the appropriate remedy. See State ex rel Corona v. Indus. Comm. (1998), 81 Ohio St.3d 587.
 {¶ 108} The magistrate notes that the commission concedes that its order contains errors, but the commission fails to specify the errors being conceded. (Commission's brief at 5.) While the commission concedes error, it nevertheless argues that its decision to deny PTD compensation should not be overturned by this action because, allegedly, the order presents a valid basis for denial of PTD compensation. According to the commission, the commission appropriately found that relator failed to participate in rehabilitation or retraining and, on that basis, the PTD application must be denied and the writ of mandamus must be denied. The commission relies upon State ex rel. Wilson v. Indus. Comm. (1997),80 Ohio St.3d 250, 253, and State ex rel. Bowling v. Natl. Can Corp. (1996), 77 Ohio St.3d 148, 153. The commission's argument is seriously flawed.
 {¶ 109} Ohio Adm. Code 4121-3-34(D) provides guidelines for the sequential evaluation of PTD applications. Ohio Adm. Code4121-3-34(D)(2) states:
 {¶ 110} "(2)(a) If, after hearing, the adjudicator finds that the medical impairment resulting from the allowed condition(s) in the claim(s) prohibits the claimant's return to his former position of employment as well as prohibits the claimant from performing any sustained remunerative employment, the claimant shall be found to be permanently and totally disabled, without reference to the vocational factors listed in paragraph (B)(3) of this rule.
 {¶ 111} "(b) If, after hearing, the adjudicator finds that the claimant, based on the medical impairment resulting from the allowed conditions is unable to return to the former position of employment but may be able to engage in sustained remunerative employment, the non-medical factors need be considered by the adjudicator.
 {¶ 112} "The non-medical factors that are to be reviewed are the claimant's age, education, work record, and all other factors, such as physical, psychological, and sociological, that are contained within the record that might be important to the determination as to whether the claimant may return to the job market by using past employment skills or those skills which may be reasonably developed. (Vocational factors are defined in paragraph (B) of this rule).
 {¶ 113} "(c) If, after hearing and review of relevant vocational evidence and non-medical disability factors, as described in paragraph (D)(2)(b) of this rule the adjudicator finds that the claimant can return to sustained remunerative employment by using past employment skills or those skills which may be reasonably developed through retraining or though rehabilitation, the claimant shall be found not to be permanently and totally disabled."
 {¶ 114} Sequential evaluation of the PTD application would be rendered meaningless if this court were to hold that the commission can deny an application based upon a finding of a failure to rehabilitate or retrain in the absence of a valid prior determination that the industrial injury permits sustained remunerative employment. See Corona, supra. Moreover, neither Wilson nor Bowling support the commission's argument that a commission order, defective on the threshold medical determination, can be upheld on grounds that the claimant failed to undergo rehabilitation or retraining.
 {¶ 115} In short, the question of whether the commission can properly deny the application based upon a finding of a failure to rehabilitate or retrain is not before this court in this action.
 {¶ 116} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying relator's PTD application, and in a manner consistent with this magistrate's decision, enter a new order either granting or denying the PTD application.